**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

MONTAÑEZ ALLMAN, et al.

*Plaintiffs*

v.                                        CIV. NO. 13-1683(PG)

HON. GARCIA PADILLA, et al.

*Defendants*

## OPINION AND ORDER

> "I think there is one higher office than
> president and I would call that patriot."
> —Gary Hart

According to the Department of Veterans Affairs, there were approximately 116,029 veterans of the United States Armed Forces in Puerto Rico[1] as of November of 2010. These veterans and their families receive an array of funds and benefits from both the Federal and State governments and also face everyday challenges in gaining access and taking advantage of those benefits. The Office of the Ombudsman for the Veterans was created to ensure that veterans and their families enjoy the services and benefits they require in a timely and efficient manner and that their rights are preserved.

This case was brought by Agustin Montañez Allman ("Montañez" or "Plaintiff"), who was named Veteran's Advocate (or Veteran's Ombudsman) by former Governor and former President of the New Progressive Party ("NPP"), Luis Fortuño ("Fortuño") in 2011. When the tides of politics brought about a new administration, the law under which Mr. Montañez had been named to his post was repealed and a new law creating the Office of the Ombudsman for the Veterans of the Commonwealth of Puerto Rico was enacted. Unbeknownst to Mr. Montañez, his tenure as Ombudsman would be short-lived. On August 28th, 2013, short of three years after he began serving his ten-year term as Ombudsman, Mr. Montañez received a letter informing him that the Office of the Advocate for Veterans created under

---

[1] "Puerto Rico and the Department of Veterans Affairs." State Summary issued by the Department of Veterans Affairs on November, 2010. Available at: http://www.va.gov/opa/publications/factsheets/ss_puertorico.pdf.

Reorganization Plan 1 of 2011 had been eliminated and that a new interim Ombudsman had been named.

Mr. Montañez handed in the keys to the office and rushed to Federal Court to request injunctive relief in order to remain in his position and to enjoin defendants from further discrimination of any kind because of his political beliefs and association. See Docket No. 1.

A little more than a week before the preliminary injunction hearing was set to take place, plaintiffs requested a Second Temporary Restraining Order ("TRO") to halt the confirmation by the Senate of the candidate that Governor Garcia Padilla nominated to occupy the position of Veteran's Ombudsman. The Court granted the TRO and ordered Governor Garcia Padilla to withdraw the nomination of Col. Hector Lopez for the post, but reserved any determination of whether Mr. Montañez should be reinstated in his position in lieu of the preliminary injunction hearing set for October 15, 2013.

The hearing was in fact held on such date and the parties submitted the matter with only the testimony of Mr. Montañez and the documents on the record. After careful consideration, the Court **GRANTS** Plaintiff's request for a preliminary injunction against defendants.

## I.    PROCEDURAL BACKGROUND

Plaintiff Montañez, among others, brought suit against defendants Alejandro García Padilla ("the Governor" or "Hon. García Padilla"), individually and as Governor of Puerto Rico; Ingrid Vilá Biaggi ("Vilá") individually and as the Governor's Chief of Staff; Jorge Irizarry Vizcarrondo ("Irizarry"), individually and as the Governor's Advisor on Social Welfare, Culture, Sports and Recreations; Rossanna López León ("López León"), individually and as Senator for the Senate of the Commonwealth of Puerto Rico; Bienvenido Ramos ("Ramos"), individually and as President of the  Transition Committee for the office of the Veteran's Ombudsman appointed by Governor García Padilla; Elizabeth López-Cabrera ("López-Cabrera"), individually and as Acting Ombudsman of the Veterans of the Commonwealth of Puerto Rico; Manuel Rivera García ("Rivera"), a service officer at the Office of the Veteran's Ombudsman and Carlos Rivas Quiñones ("Rivas"), individually and as Executive Director of the Office of Management and Budget of the Commonwealth of Puerto Rico.

The plaintiffs sought declaratory and injunctive relief as well as compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for violations to the First, Fifth and Fourteenth Amendments to the Constitution of the United States of America, as well as Article 1802 of the Puerto Rico Civil Code, P.R. LAWS ANN. tit. 31, § 5141.

Plaintiffs asked the Court to issue a TRO ordering defendants to vacate the appointment of López-Cabrera as Acting Veteran's Ombudsman and allow Montañez to return to his duties without interference on defendants' part with the operations at the offices of the Veteran's Ombudsman. Plaintiffs also moved the Court to preclude any attempt to remove Montañez or members of his staff pending resolution of the claims.

The Court denied the plaintiffs' request for a TRO on procedural grounds insofar as the documents submitted did not include an affidavit or verified complaint that laid down the specific facts upon which the request was premised, as required by FED. R. CIV. P. 65(b). A preliminary injunction hearing was set for September 17, 2013.

At the hearing, it transpired that plaintiffs had not yet served defendants with the summons and complaint for which reason the court ordered plaintiffs to serve process and rescheduled the preliminary injunction hearing for October 15, 2013. See Docket No. 9.

On October 1, 2013 plaintiffs filed an Amended Complaint. See Docket No. 11. A Second Amended Complaint followed on October 6, 2013. See Docket No. 12. Simultaneously, plaintiffs filed the Second Motion for Temporary Restraining Order asserting that the Governor unlawfully nominated Colonel Hector Lopez ("Col. Lopez") as Veteran's Ombudsman and submitted such appointment to the Senate of Puerto Rico for its consideration and confirmation on October 3, 2013 despite being fully aware of the existence of the present action and the hearing scheduled for October 15, 2013 to discuss the merits of plaintiffs' request for a preliminary injunction.

Accordingly, plaintiffs included Col. Lopez, and the Senate of Puerto Rico — represented by its president Hon. Eduardo Bhatia Gautier and the president of the Commission for Judiciary, Security and Veteran's Affairs, Hon. Miguel Pereira Castillo — as defendants to the present action and asked that the Court order the Governor to vacate Col. Lopez's

nomination for appointment and preclude the Senate of Puerto Rico from proceeding with his confirmation until the Court issued a determination with respect to the constitutionality of defendants' actions. See Docket No. 14. The Court granted plaintiffs' request and ordered Governor García Padilla to withdraw the nomination of Col. López until such time as the Court ruled on the request for a preliminary injunction. See Docket No. 18.

On October 15, 2013 the Court held the preliminary injunction hearing with the appearance of the parties. The only testimony presented at the hearing was proffered by Mr. Montañez himself.

## II.   FACTUAL BACKGROUND

On March 8th, 2010, Mr. Montañez was appointed by former Governor Luis Fortuño as Veteran's Advocate pursuant to Law No. 57 of June 27, 1987 ("Law No. 57"), which created the Puerto Rico Veterans Advocate's Office. The Office was originally attached to the Department of Labor and Human Resources. Law No. 57 did not include a fixed term for the position of Veteran's Advocate. On June of 2010, the Senate confirmed Mr. Montañez.

On June 22nd, 2011, former Governor Fortuño signed Reorganization Plan No. 1-2011 ("Reorganization Plan"),[2] which effectively repealed Law No. 57. The Reorganization Plan, also known as the Advocate Offices Reorganization Plan, created four Advocate Offices and an Office of Administration for Advocate Offices ("OAP" for its Spanish acronym), an entity under which all the administrative powers, functions and duties of the individual offices would be consolidated.

The Reorganization Plan also created a new office, called the Office of the Advocate for Veterans ("Oficina del Procurador del Veterano"). The new office was the entity within the Executive Branch responsible for protecting the rights of veterans in Puerto Rico. The Reorganization Plan also changed the position of Veteran's Advocate from one of free removal to one with a fixed term of ten years. In addition, the Reorganization Plan provided that the Governor could only declare a vacancy in the position of the Veteran's Advocate if the former determined that the Veteran's Advocate was "permanently impaired" or had

---

[2] Attachment No. 1 to this order is a certified translation of the Reorganization Plan.

been "negligent in discharging the duties of the office" or had "incurred in misconduct." See Attachment 1 at pages 20-21. Prior to declaring the vacancy, the law required the Governor to give the Advocate notice and a hearing. Id.

After the Reorganization Plan came into effect, Mr. Montañez was re-nominated by Governor Fortuño to the position of Advocate for the Veterans. On or around November of 2011, he was unanimously confirmed by the Senate for the position. Thus, his term was to expire on November of 2021.

On November 6, 2012, general elections were held in Puerto Rico and Garcia Padilla, who was a Senator at the time, won the Governorship for the Popular Democratic Party ("PDP"). Soon thereafter, several bills were introduced purporting to change once again the structure of the different Ombudsmen Offices. Particularly, Senate Bill No. 356 sought to create an office dubbed the "Veteran's Ombudsman Office of the Commonwealth of Puerto Rico."

On July 24, 2013, the bills were signed by Governor García Padilla and became Laws No. 75-2013 through 79-2013. Law No. 75 repealed Reorganization Plan 1-2011. Moreover, Law No. 75 provides that within thirty days after its approval, all the resources from the OAP should be transferred to the different Offices of the Ombudsman, under advise of the Office of Management and Budget ("OGP" by its Spanish acronym). See Docket No. 28-3 at page 2.

Law No. 79, for its part, created the "Office of the Veterans Advocate of the Commonwealth of Puerto Rico" and the position of Veterans Advocate. See Docket No. 34-1. Pursuant to Article 5 of Law No. 79, the latter would be appointed by the Governor with the consent and approval of the Senate and is called to serve a term of ten years or until his successor is appointed and takes office. See Docket No. 34-1 at page 5.

According to plaintiffs' allegations, on or around August 19, 2012, Mr. Bienvenido Ramos, former employee of the Office of the Veteran's Ombudsman, delivered a letter dated August 16, 2013 and signed by Governor García Padilla to Montañez, as well as a document titled Petition of Information. See Docket No. 12, ¶¶ 31-32. The letter informed Mr. Montañez that Mr. Ramos had been appointed as President of the team

that would oversee the transition from the extinct Office of the Veteran's Ombudsman to the new Office of the Veterans Advocate of the Commonwealth of Puerto Rico. The letter also asked Mr. Montañez for his assistance to the Transition Committee, but made no mention of Plaintiff's termination or removal from his position. See Docket No. 3-3.

The Plaintiff alleges that on August 23, 2013, Mr. Montañez received a second petition of information for sensitive and confidential material, documents and property, such as keys and computer passwords. See Docket No. 12, ¶ 35. The Plaintiff testified during the hearing that still, at that point, he had not been informed of his removal or termination. Mr. Montañez provided the items and information requested.

The Plaintiff also testified that it wasn't until August 26, 2013 that he learned through the press that Ms. Ingrid Vila had announced that the Ombudsmen would cease functions that same day and that the Governor would be making an announcement of the new interim appointments.

Two days later, while at an official event held at the Office of the Resident Commissioner of Puerto Rico, Pedro Pierluisi, Mr. Montañez alleges he received a copy of a press release dated that same day and issued by Vila, where she announced the designation of López-Cabrera as Acting Veteran's Ombudsman. See Docket No. 12, ¶ 37; Docket No. 3-5.

That afternoon, the Plaintiff received a letter from Vila indicating that pursuant to Laws No. 75 and 79, the Ombudsman Office created under the Reorganization Plan ceased to exist. As such, all the documents, files, materials, equipment and funds assigned to the extinct Office of the Veteran's Ombudsman would be transferred to the new Office of the Veterans Advocate of the Commonwealth of Puerto Rico. The letter also requested that Mr. Montañez make available all documents, files, materials, equipment, funds and resources to the newly appointed Acting Ombudsman. See Docket No. 3-6. Mr. Montañez testified at the injunction hearing that, prior to receiving the letter, he made several attempts to contact Ms. Vila, but was unsuccessful.

### III.  LEGAL STANDARD

#### A. Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*,

carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (citing WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, CIVIL 2d § 2948) (emphasis ours). The determination of whether this burden has been met rests within the realm of the court's discretion. See Deckert v. Independence Shares Corp., 311 U.S. 282, 290 (1940); Anheuser-Busch, Inc. v. Teamsters Local No. 633, Nat. Conference of Brewery & Soft Drink Workers, 511 F.2d 1097, 1099 (1st Cir.1975) (citations omitted), cert. denied, 423 U.S. 875 (1975).

The standard for issuing a preliminary injunction is oft-quoted a four factor test: (1) the likelihood of success on the merits; (2) the potential for irreparable injury; (3) a balancing of the relevant equities most importantly, the hardship to the nonmovant if the relief issues as contrasted with the hardship to the movant if relief is withheld; (4) the effect on the public interest of a grant or denial of the relief. See New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir.2002); Ross-Simons of Wardwick, Inc. V. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.1996); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir.1991). "Of these four factors, the probability-of-success component [is] … critical in determining the propriety of injunctive relief." Lancor v. Lebanon Housing Authority, 760 F.2d 361, 362 (1st Cir.1985). The overseeing appellate court has called the likelihood of success factor the "sine qua non" of the preliminary injunction test. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir.1993); see also SEC v. Fife, 311 F.3d 1, 8 (1st Cir.2002).

In addition, the potential for irreparable injury criteria "must not be assumed, it must be demonstrated … speculation injury does not constitute a showing of irreparable harm." Narragansett Indian Tribe v. Guilbert, 934 F.2d at 6-7 (internal citations omitted). The comparable hardship factor requires the court to examine, and perform a comparison between the injuries suffered by plaintiff outweighing any harm which granting injunctive relief would inflict on the defendant. See DeNovellis v. Shalala, 135 F.3d 58, 77 (1st Cir.1998); Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Cir.1981). The final and fourth criterion, namely, the effect on the public interest, is measured by whether the public interest would be better served by issuing than by

denying the injunction. See Massachusetts Coalition of Citizens with
Disabilities, et al., v. Civil Defense Agency and Office Emergency
Preparedness, 649 F.2d 71, 74 (1st Cir. 1981.)

**IV.   DISCUSSION**

**A. Due Process Claims**

**1. Substantial Likelihood of Prevailing on the Merits**

In order to prevail in their request for a preliminary injunction
on the basis of the alleged violations to the due process guarantees of
the Fourteenth Amendment, the plaintiffs must first show a substantial
likelihood that they will prevail on the merits. That is, plaintiffs must
demonstrate that the ten-year term of employment bestowed upon the
Veteran's Ombudsman a constitutionally-protected property interest in
continued employment for the duration of such fixed term, which in turn
entitled him to enjoy the due process guarantees provided by the
Fourteenth Amendment.

"Under the Due Process Clause of the Fourteenth Amendment, persons
who possess a property interest in continued public employment cannot be
deprived of that interest without due process of law." Figueroa-Serrano
v. Ramos-Alverio, 221 F.3d 1, 5-6 (1st Cir.2000) (citing Kercado-Melendez
v. Aponte-Roque, 829 F.2d 255, 263 (1st Cir.1987). "In a due process
claim stemming from the termination of employment, 'a public employee
must first demonstrate that he has a reasonable expectation, arising out
of a statute, policy, rule, or contract, that he will continue to be
employed.'" Acevedo-Feliciano v. Ruiz-Hernandez, 447 F.3d at 121 (quoting
Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 101 (1st Cir.2002).
"It is well established, both in Puerto Rico and in federal law, that a
person has secured a property right in his employment if he has an
expectation of continuity in said employment." Quiles Rodriguez v.
Calderon, 172 F.Supp.2d 334, 344 (D.P.R.2001) (internal citations
omitted) (holding that the Chair of the Public Service Commission, an
employee appointed by the Governor to a term position, cannot be
terminated at the will of the Governor before the end of his term). "In
order to establish a constitutionally-protected property interest, a
plaintiff must demonstrate that [he] has a legally recognized expectation
that [he] will retain [his] position. A legitimate expectation of

continued employment may derive from a statute, a contract provision, or an officially sanctioned rule of the workplace." <u>Santana v. Calderon</u>, 342 F.3d 18, 24 (1st Cir.2003) (<u>citing</u> <u>Perry v. Sindermann</u>, 408 U.S. 593, 601-02, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)).

"If the employee has such a state property interest, and that property interest rises to the level of a legitimate claim of entitlement, … then the employer cannot dismiss the employee without affording him due process of law." <u>Acevedo-Feliciano v. Ruiz-Hernandez</u>, 447 F.3d at 121 (internal quotation marks and citations omitted). "At a minimum, due process rights entitle such individuals to 'notice and a meaningful opportunity to respond' prior to termination." <u>Figueroa-Serrano v. Ramos-Alverio</u>, 221 F.3d at 5-6 (<u>citing</u> <u>Kercado-Melendez v. Aponte-Roque</u>, 829 F.2d 255, 263 (1st Cir.1987). <u>See also</u> <u>Acevedo-Feliciano v. Ruiz-Hernandez</u>, 447 F.3d at 121 ("In the public employment context, the required process typically includes 'some kind of hearing' and 'some pretermination opportunity to respond.'").

In this case, the question is whether or not the Plaintiff had a property interest in his employment that would trigger the constitutional protection of the Due Process Clause. However, any ruling on this constitutional right question is narrowly intertwined with the separation of powers doctrine in the Puerto Rico Constitution. Therefore, Plaintiff's "expectation of continued employment is constrained by two sources: the enabling statute creating the position … , and the Governor's power of removal under the Constitution of Puerto Rico. We address these in turn." <u>Santana v. Calderon</u>, 342 F.3d at 24.

The position of the Veterans Advocate is statutorily created. The relevant statute at the time the Plaintiff was named provided as follows:

> The Office of the Veteran's Advocate is hereby created as the body in the Executive Branch entrusted with, among other duties as provided in this Plan, handling and investigating claims by veterans in Puerto Rico and for safeguarding their rights in areas such as education, healthcare, security, employment, civil and political rights, social, labor and tax laws, housing, transportation, recreation, culture and others as referred by the AOA. Likewise, it shall be responsible for establishing and implementing a program to provide assistance, orientation, and advice to protect the rights of veterans and their families, and for coordinating with

> the corresponding entities the necessary services to be
> provided to veterans in Puerto Rico.

See Chapter V, Article 24 of the Reorganization Plan No. 1-2011, Attachment 1 at page 20. The Reorganization Plan also provided that "[t]he Veterans Advocate shall be appointed by the Governor with the advice and consent of the Senate and shall hold office for a term of ten (10) years or until his/her successor is appointed and takes office." Article 25 of the Reorganization Plan, Attachment 1 at page 20. Therefore, it stems from the clear language of the enabling statute that a fixed ten-year term attached to the position.

"The Governor of Puerto Rico has a general power of removal that is statutorily derived." Santana v. Calderon, 342 F.3d at 25. "The Governor shall have power to remove any officer whom he may appoint, except officers whose removal is otherwise provided for by the Constitution, and he may declare the office vacant and fill the same in the manner provided by law." P.R. LAWS ANN. tit. 3, § 6 (2002). It follows, thus, that "[t]he language 'in the manner provided by law' indicates that the legislature may specify how an officer appointed by the Governor is to be removed." Santana v. Calderon, 342 F.3d at 25. Despite the fact, however, that the Puerto Rico legislature may limit the Governor's power to remove an officer from his position, this court must consider whether or not any limitation imposed by the Legislature is at odds with the separation of powers doctrine, to wit, the Governor's *constitutional* power of removal.

The Governor's constitutional power of removal stems from Article IV of the Constitution of Puerto Rico, which provides, in relevant part that "[t]he Governor shall execute the laws and cause them to be executed. … He shall appoint, in the manner prescribed by this Constitution or by law, all officers whose appointment he is authorized to make." P.R. CONST. art. 4, § 4. The Puerto Rico Supreme Court spoke at length on the scope of the Governor's power of removal under the Constitution in both Guzman v. Calderon, 164 P.R. Dec. 220 (2005) and Santana v. Gobernadora, 165 P.R. Dec. 28 (2005).

In Guzman v. Calderon, the Supreme Court of Puerto Rico, upon this court's request of a writ of certification, held that, where the officers in question "do not perform "purely executive" functions," Guzman v. Calderon, 164 P.R. Dec. at 241, Attachment 2 at page 11, the "just cause"

requirement for removal of members of the Board of Directors of a public corporation that the relevant organic act provided for "does not impermissibly impede the Governor's constitutional duty to execute the laws and cause them to be executed" and "does not infringe on the Governor's constitutional power to remove public officers." Guzman v. Calderon, 164 P.R. Dec. at 242-243, Attachment 2 at page 12. In the case of officers who perform quasi-legislative or quasi-judicial functions, the Supreme Court of Puerto Rico found that any reasonable restriction on the Governor's power of removal would be valid, unless it impedes the Governor's power to perform his or her constitutional duties. Id. at 238-239, Attachment 2 at page 10.

The Supreme Court of Puerto Rico analyzed the restriction imposed in this case on the Governor's constitutional power of removal, to wit, the "just cause" requirement, in light of the legal framework set forth in the United States Supreme Court cases that analyze the scope of the President's power of removal, namely: (1) Myers v. United States, 272 U.S. 52, 126, 47 S.Ct. 21, 71 L.Ed. 160 (1926), (2) Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), (3) Wiener v. United States, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), and (4) Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). See Guzman v. Calderon, 164 P.R. Dec. at 234-238, Attachment 2 at pages 7-9. The Supreme Court of Puerto Rico followed United States Supreme Court precedent after finding that "it was the intention of the constitutional delegates to incorporate into our jurisdiction standards similar to those adopted in the federal jurisdiction with respect to the scope of the Legislative Assembly's power to intervene … in the powers delegated to the Executive Branch." Guzman v. Calderon, 164 P.R. Dec. at 233, Attachment 2 at page 6. As a result, "in keeping with the mandate to adopt the federal interpretation of this matter given to us by the members of the Constitutional Convention when they debated the scope of the Governor's removal power," id. at 238, Attachment 2 at page 9, the Supreme Court of Puerto Rico essentially found that the Governor's power of removal is analogous to the President's power under federal law. Therefore, after thoroughly discussing the United States Supreme Court findings in *Myers*, *Humphrey's*

*Executor*, *Wiener* and *Morrison*, the Supreme Court of Puerto Rico established that, as a starting point to the analysis, "any determination on the constitutionality of a statutory restriction on the Governor's appointment or removal power requires a case-by-case analysis in which it is imperative to identify whether the officer performed functions that were 'purely executive' in nature, or whether he or she exercised quasi-legislative or quasi-judicial powers." Id. The court then set forth the applicable test, as follows:

> If the officer has "purely executive" powers, the power of the Legislative Branch to impose requirements for the removal of said officer is minimal, because in most cases these officers are directly involved in the implementation of public policy and in the performance of functions assigned by the Constitution to the Executive Branch.
>
> The main test to determine the validity of the statute consists in that the legislative restriction on the removal power of the Governor of Puerto Rico cannot impermissibly and unreasonably infringe on his or her constitutional power to execute the laws and cause them to be executed and to formulate and implement public policy. An examination of the statute requires that the legislative restriction on said power should not impermissibly limit the powers of the Executive Branch or injure the balance of powers that must exist between government branches.
>
> The case of officers who perform quasi-legislative or quasi-judicial functions is quite different. The Legislative Assembly can delegate to these officers a greater degree of independence, allowing them to perform their functions free from intrusion by other government branches. Therefore, in that case, any reasonable restriction on the Governor's power of removal would be valid - unless, of course, it impedes the Governor's power to perform his or her constitutional duties.

Id. at 238-239, Attachment 2 at pages 9-10.

Shortly thereafter, in Santana v. Calderon, the Supreme Court of Puerto Rico, once again upon this court's request of a writ of certification, held that the functions of the Executive Director of the Occupational Development Council are strictly executive in nature, Santana v. Gobernadora, 165 P.R. Dec. at 60, Attachment 3 at page 43, and although the organic law of the position in question provides that it

be held for a fixed term of four years, it found that this term provided for in the law is "merely a directive one." Id. at 62, Attachment 3 at page 46. "That term does not establish a mandatory time period to fill the position and therefore does not confer upon that functionary a proprietary interest therein. That term does not deprive the Governor, either, of his or her prerogative to remove the functionary of the position if he or she deems it necessary and prudent." Id.

In analyzing the scope of the Governor's power of removal under the Puerto Rico Constitution, much like in *Guzman*, the Supreme Court of Puerto Rico in Santana v. Calderon also looked to the United States Supreme Court caselaw, and found that:

> As we can see, when our Constitution was approved we made ours the analysis model presented in Myers and *Humphrey's Executor*, to evaluate under what circumstances the Legislative Assembly can impose restrictions on the Governor to remove functionaries of the Executive. In other words, the *decisions in those cases determine the boundaries of the Governor's power to appoint and his or her power to remove and the limitation that such power necessarily represents for the exercise of the Legislative Assembly's prerogatives.*
>
> …
>
> In light of the above, and considering that the Commonwealth Constitution is modeled in broad strokes after the government structured contained in the United States Constitution, it is appropriate for us to go over, in greater detail, the manner in which this subject has been treated by the United States Supreme Court, paying special attention to the decisions in *Myers* and *Humphrey's Executor*.

Id. at 51-52, Attachment 3 at pages 29-30. After deciding that it would follow United States Supreme Court precedent in the analysis of the Governor's power of removal under the Puerto Rico Constitution and summarizing these cases' findings, the Supreme Court of Puerto Rico found that a joint analysis of *Myers*, *Humphrey's Executor* and *Wiener* stood for the following principles:

> First, that the President's power to remove an official whose functions are purely executive is absolute. The second principle poses that when the functions carried out by the executive functionary partake of the attributes of the legislative or judicial function, Congress does have the authority

> to condition the removal of that functionary from
> his or her post, by imposing, **for example**, the
> requirement of just cause for the removal.

Id. at 55 (emphasis ours), Attachment 3 at pages 35-36 (emphasis ours).
We note the use of the phrase "for example" because in *Humphrey's
Executor*, the Supreme Court of the United States held that Congress could
validly limit the President's power of removal of officers with quasi-
legislative and quasi-judicial functions, and in this exercise has the
power to: (1) "fix the period during which they shall continue,"
Humphrey's Executor, 295 U.S. at 629, and (2) "forbid their removal
except for cause in the meantime." Id.; see also Santana v. Gobernadora,
165 P.R. Dec. at 54, Attachment 3 at page 34, Guzman v. Calderon, 164
P.R. Dec. at 236, Attachment 2 at page 8.

Finally, the Supreme Court of Puerto Rico noted that in *Guzman*, it
had "adopted the 'totality of circumstances' analysis in Morrison to
define the interrelation between the Governor's power to appoint and
remove in light of the Legislative Assembly's prerogatives." Santana v.
Gobernadora, 165 P.R. Dec. at 59, Attachment 3 at page 36. And thus, it
applied the standard outlined therein to the case before it. Id.

Following the framework carefully laid down in *Guzman* and *Santana*,
the Court must first determine whether the Veteran's Ombudsman performs
quasi-legislative and/or quasi-judicial functions. If so, then the
Legislative Assembly can delegate to these officers a greater degree of
independence and impose limitations on the Governor's power of removal.

Law No. 79 confers upon the Ombudsman the following powers and
prerogatives: (a) conduct investigations and obtain information he may
deem pertinent regarding the complaints he investigates; (b) hold
administrative hearings and sight inspections; (c) take oaths and
statements; (d) inspect records, inventories, documents and physical
facilities of the public agencies or private entities subject to the
provisions of the law; (e) appear on behalf of the veterans and their
families to obtain benefits under the pertinent state or federal laws or
regulations before any forum, court, board, commission or state or
federal agency; (f) order the appearance and testimony of witnesses as
well as the production of papers, books, documents and other evidence
relevant to the investigation. See Article 9 of Law No. 79, Docket No.

34-1. Law No. 79 also gives the Ombudsman the power to investigate, process and adjudicate complaints as well as order compliance with the applicable legislation in those cases in which any person or entity, including public ones, deny or hinder in any way the rights and benefits granted to veterans and their families. See Article 8 of Law No. 79, Docket No. 34-1.

The Supreme Court of Puerto Rico has found an entity to have quasi-judicial functions when, in the exercise of its adjudicative power, it has the prerogative to hold hearings; issue citations; take sworn testimony and statements from witnesses; receive evidence and issue resolutions and determinations directed to individuals, employers or organizations to cease and desist of any illegal practice. See Plan de Salud U.I.A v. A.A.A., 169 P.R. Dec. 603(2009); Rivera Santiago v. Srio. De Hacienda, 119 P.R. Dec. 265 (1987) and Murphy Bernabe v. Tribunal Superior, 103 P.R. Dec. 692 (1975).

Mr. Montañez declared under oath that he received evidence relevant to the investigation of complaints filed by veterans before the Office of the Ombudsman. He also testified that he has threatened to impose fines and other penalties to those that were not complying with the regulations and laws that protect veterans and their families, a clearly quasi-judicial function. See Hernandez Chiques v. F.S.E., 152 P.R. Dec. 941 (2000) (finding that the Industrial Commission of Puerto Rico, in its quasi-judicial functions, may impose sanctions).

The Ombudsman also has the ability to adopt and promulgate whatever rules and regulations are needed to ensure the implementation of the provisions of Law 203-2007, as amended, known as the "Bill of the Rights of the Puerto Rican Veteran of the 21st Century" thus having quasi-legislative functions. See Article 13 of Law No. 79, Docket No. 34-1. As a matter of fact, according to the Plaintiff's testimony, the Office of the Ombudsman recently approved a regulation to provide an educational grant for children of veterans in Puerto Rico, a clearly quasi-legislative function.

Notably, the Office of the Veteran's Ombudsman shall be the agency in charge "of the administration of any state or federal program that, due to its nature, purpose and scope, is related with the functions that

are entrusted" by the law. See Article 7 of Law No. 79, Docket No. 34-1. To that effect, during his testimony, Mr. Montañez emphasized that the Office is in charge of overseeing two federally-funded projects: a Veterans' Home that houses around 150 veterans and is the only one of its kind in Puerto Rico and the Caribbean and a Veteran's Cemetery. The guidelines and funding for these projects are solely provided by the Federal Government and the Ombudsman is charged with ensuring their implementation, independent from any State intervention.

It stems thus from the enabling law and the Plaintiff's testimony of the duties he performed, that the Office of the Veteran's Ombudsman is more a quasi-judicial body than a purely executive one and that the Veteran's Ombudsman is a position that has quasi-legislative and quasi-judicial functions. Hence, as set forth in *Santana* and *Guzman*, the Legislative Assembly may impose restrictions on the Governor's power of removal to ensure that the official has independence to carry out his functions without intervention from the Executive Branch.[3]

Those limitations may be in the form of a mandate of just cause for removal or a fixed term for the position. See Humphrey's Executor, 295 U.S. at 629. In the case at hand, the restrictions took the form of a statutorily defined term. The ten-year term set forth in the statute was first incorporated in the Reorganization Plan of 2011. According to the testimony of Mr. Montañez, the veteran community in Puerto Rico had been lobbying for years to amend the law that created the Office of the Veteran's Ombudsman to bestow the position of Ombudsman with a fixed term and afford the Office with some continuity.

When the lawmakers drafted Law No. 79, they maintained the ten-year term and, in fact, eliminated the provisions contained in the Reorganization Plan regarding removal of the Ombudsman in case of

---

[3] The testimony of Mr. Montañez is further evidence that the Legislative intent was to grant independence to the Office of the Veteran's Ombudsman. For example, Mr. Montañez mentioned that the Office recently represented a veteran in a proceeding against the Puerto Rico Treasury Department. He also pointed out that the Office had a meeting with former Governor Fortuño to dissuade him from passing a law that purported to eliminate some tax exemptions for veterans. We think it clear that both instances show that the Office of the Veteran's Ombudsman is concerned first and foremost with protecting the rights of the veterans and their families, even in circumstances that could place its actions at odds with the public policy of the Commonwealth's Executive Branch.

negligence or misconduct. That is, unlike its predecessor, nothing in Law No. 79 gave the Governor express power to remove the Ombudsman.

The scenario before us is remarkably similar to the set of facts in the case of *Wiener*. In that case, the law that established the War Claims Commission contained no provision with respect to removal of its commissioners. The United States Supreme Court, upon finding that the War Claims Commission was an adjudicative body, concluded that in light of *Humphrey's Executor* holding, the President derived no implied power from statute to remove a member of the Commission "merely because he wanted his own appointees." <u>Wiener</u>, 357 U.S. at 356.

The court thus concludes that, here, by including a fixed term of ten years, the Legislature gave a clear indication of its desire to preserve separability between the Office of the Veteran's Ombudsman and the Executive Branch. We thus find that the Legislature validly limited the Governor's power of removal of the Veterans Ombudsman and that he had an expectation of continuity in said employment. <u>See</u> <u>Quiles</u>, 172 F.Supp.2d at 344 (<u>citing</u> <u>Nieves-Villanueva v. Soto Rivera</u>, 133 F.3d 92 (1st Cir. 1997)). Accordingly, he had a property interest in his position that validly stemmed from the enabling statute under which he was appointed.

Defendants contend that Mr. Montañez's due process rights have not been violated because he was not terminated "but rather his tenure ceased because his position, as well as the agency/office created by Reorganization Plan No. 1 of 2011, were abolished by the Puerto Rico Legislature by enacting Acts 75-2013 and 79-2013 which were later signed into law by the Governor of Puerto Rico, Hon. Alejandro García Padilla." <u>See</u> Docket No. 6 at page 18. Defendants look to state jurisprudence, particularly to the case of <u>Gomez v. Negron</u>, 65 P.R. Dec. 305 (1945), for the theory that abolishing a position created by the Legislative Assembly does not violate any constitutional right of the incumbent as long as the action is done in good faith. <u>Gomez</u>, P.R. Dec. at 312. Firstly, the *Gomez* case is distinguishable from the controversy before this court insofar as the former reached the Supreme Court of Puerto Rico via writ of mandamus and is thus devoid of any reasoning under the Fourteenth Amendment to the Constitution. Secondly, *Gomez* was decided before the *Wiener* and *Morrison*

cases, which limited the President's power of removal under the Constitution in the case of quasi-judicial and quasi-legislative officers.

But most importantly, the *Gomez* holding is based on the comparison that the Court made of the law that was repealed versus the newly enacted law. After carrying out that exercise, the Supreme Court of Puerto Rico in *Gomez* held that because the new law substantially modified the terms of the position and the manner of appointment, the former post had in fact been abolished. See *Gomez*, 65 P.R. Dec. at 310-12.

Despite defendants' efforts to distinguish the nature and functions of the Office of the Veterans Advocate under the Reorganization Plan and the Office of the Veterans Advocate of the Commonwealth of Puerto Rico under Law No. 79, after a perfunctory review of both statutes, the court is not convinced at this point that such minor differences fundamentally change in any way the nature of the position. The court, however, will not dwell on this point insofar as it is irrelevant to the analysis under the Fourteenth Amendment.

Having found that Mr. Montañez has an expectation of continuity, and thus, a property interest in his position, it follows that he is protected by the provisions of the Fourteenth Amendment. If the employee has proven to have a property interest, then the employer cannot dismiss him without affording him due process of law. See Acevedo, 447 F.3d at 121.

The record shows that Montañez did not receive a formal termination letter and was not afforded the opportunity to be heard prior to his removal. In fact, the evidence presented thus far shows that Plaintiff merely received a letter informing him that the law under which he was named no longer existed and he was to be substituted. In fact, the record is devoid of any evidence that Montañez engaged in conduct that amounted to negligence or that he failed to fulfill the duties of his position in any way. Not having been given a proper notice and a meaningful opportunity to respond, the court finds that the defendants violated the Plaintiff's due process rights in the manner in which he was removed from his position as Veterans Advocate, the term of which was to expire on November, 2021 pursuant to the provisions of the Reorganization Plan.

Hence, the Court finds that plaintiffs have met the first prong of the preliminary injunction standard by proving their likelihood of prevailing on the merits.

## 2. Irreparable Injury

The irreparable injury analysis in this case centers on whether Mr. Montañez had a property interest in his employment. The Court will also look at the injury that the Office of the Ombudsman is suffering and will continue to suffer as result of his removal.

Irreparable harm consists of a substantial inquiry that is not accurately measurable or adequately compensable by money damages. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8 (1st Cir. 2000). Mr. Quiñones has a property interest in his employment that is cloaked with Constitutional protection. His termination has resulted in the loss of his salary, but has also resulted in humiliation and shame in the eyes of the public and his peers, according to his testimony before the court. Mr. Montañez testified that he has suffered harm to his personal and professional reputation.

Mr. Montañez also expressed concern as to the state of the Office of the Veterans Advocate since it works closely with federal agencies and has several on-going projects that can lose sponsorship and/or funding if left unattended. Specifically, Mr. Montañez pointed out that the Veteran's Cemetery was scheduled to open in November of 2013 and several steps needed to be undertaken to ensure that the funds designated for the project, to wit, $7.1 million, would not have to be returned to the Department of Veterans Affairs for lack of compliance with federal guidelines.

These elements cannot be adequately measured or are not compensable by money damages, and thus, the court finds that the second requirement of the preliminary injunction test weighs in plaintiffs' favor.

## 3. Balance of Harms

"When resolving preliminary injunction motions, '[a]ny potential harm caused to [a plaintiff] by the denial of [his] motion must be balanced against any reciprocal harm caused to [the defendant] by the imposition of an injunction.'" Avaya, Inc. v. Ali, No. 12-10660-DJC, 2012 WL 2888474, at *8 (D.Mass. July 13, 2012) (citing Touchpoint Solutions,

Inc. v. Eastman Kodak Co., 345 F.Supp.2d 23, 32 (D.Mass.2004). In the case at hand, the balancing of hardship factor also favors Plaintiff. During the pendency of these proceedings, the Plaintiff has been deprived of his title and his salary. On the other hand, defendants have not advanced any persuasive argument explaining how the Governor's constitutional powers of removal would in any way be hindered by the Legislature's limitation that the Veterans Advocate remain in the position for the remaining of the ten-year term to which he was appointed. Moreover, co-defendant Lopez-Cabrera only has an interim designation as Veterans Advocate, and thus, does not have a property interest in her employment. In addition, the Governor's candidate, Col. Hector Lopez, is also not yet in office inasmuch as this court ordered the Governor to withdraw his nomination for appointment until we ruled on the Plaintiff's request for a preliminary injunction. See Docket No. 18. Therefore, the defendants cannot be harmed by the issuance of this injunction in the same way the Plaintiff can were this court not to issue the same.

### 4. Public Interest

A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir.2003). Here, the court finds that this factor also tips in the Plaintiff's favor inasmuch as the public interest will not be harmed by the issuance of this injunction. As stated by the Plaintiff during his testimony, the reason the Legislature in 2011 set a fixed ten-year term for the Veteran's Ombudsman was in response to the veterans' continued requests for continuity. "Continuity and better implementation of public policy was the goal of these limits, and the knowledge that one with more experience will necessarily operate better and more efficiently than one who has less experience." Quiles Rodriguez, 172 F.Supp.2d at 345. Moreover, in addition, "the fact that the Founding Fathers established the doctrine of separation of powers, … towards prohibiting exactly this kind of crass intrusion make the argument for erring on the side of [Plaintiff] even more compelling." Id. The limitation set by the Legislature in establishing a fixed term for the position of Veteran's

Advocate evinces its desire for the officer to be "free from 'political domination or control' or the 'probability or possibility of such a thing'; to be 'separate and apart from any existing department of the government—not subject to the orders of the President.'" Humphrey's Executor, 295 U.S. at 625.

The Court consequently holds that it is in the public interest that the Legislature's intent be upheld and the Plaintiff's property interest be protected. Therefore, the fourth and final prong of the test for the preliminary injunction also tips in the Plaintiff's favor.

### B. FIRST AMENDMENT

The Plaintiff also claims that the defendants violated his First Amendment rights by politically discriminating against him. According to the Plaintiff, he was removed from his position as Veterans Advocate because of his political affiliation to the NPP.

The First Amendment to the United States Constitution "insulates public employees who hold nonpolicymaking positions from the vicissitudes of personnel decisions rooted in partisan political concerns." Bergeron v. Cabral, 560 F.3d 1, 7 (1st Cir.2009) (citing Rutan v. Repub. Party of Ill., 497 U.S. 62, 74-76 (1990)). In essence, "[g]overnment officials are forbidden by the First Amendment from taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of the employment." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 13 (1st Cir.2011) (citing Rutan, 497 U.S. at 75-76; Welch v. Ciampa, 542 F.3d 927, 938-39 (1st Cir.2008)). To make out a prima facie claim of political discrimination, a plaintiff mush show: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Ocasio-Hernandez, 640 F.3d at 13 (citing Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228, 239 (1st Cir.2010)). However, "[t]he prohibition on encroachment of First Amendment protections is not an absolute." Elrod v. Burns, 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

> The First Amendment political affiliation right
> described in the line of cases from Elrod to Branti

> v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d
> 574 (1980), and Rutan v. Republican Party of Ill.,
> 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990),
> is cabined by an exception designed to give room to
> elected representatives to make policy choices
> reflective of their party platforms.

Torres Rivera v. Calderon Serra, 412 F.3d 205, 211 (1st Cir.2005) (citing Branti, 445 U.S. at 517–18, 100 S.Ct. 1287; Rutan, 497 U.S. at 74, 110 S.Ct. 2729.

It is uncontested that the Plaintiff is affiliated with the NPP and was in fact named to the position of Veterans Advocate by former Governor Fortuño. It is also a fact that defendant Governor Garcia Padilla is the current President and member of the PDP, the opposing party to the NPP. Therefore, the first prong of the applicable test is easily met. The Plaintiff testified during the hearing that he personally knows the Governor since prior to his nomination as Ombudsman because they worked together as members of the Puerto Rico Bar Association from 2004-2006. According to the Plaintiff, the members would sustain what sometimes turned into "heated" political discussions, during which the Plaintiff expressed his "pro-American" political views. Given this evidence, it can be reasonably concluded that Hon. Garcia-Padilla knew of Plaintiff's political affiliations, thereby, establishing the second element of the test. The parties also stipulated the third prong of the test, namely, that the Plaintiff suffered an adverse employment action. On August 28th, 2013, Plaintiff received a letter notifying him of his removal from his position as Veterans Advocate.

However, "[m]erely juxtaposing a protected characteristic - someone else's politics - with the fact plaintiff was treated unfairly is not enough to state a constitutional claim." Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir.1990) (citation omitted). At this stage of the proceedings, the Plaintiff has failed to adduce to sufficient evidence to establish the final element of the prima facie case, to wit, the causation requirement. Although the Plaintiff vehemently testified that his political affiliation *must have been* the reason why the Governor removed him from his position, the letter he received states that his position ceased to exist pursuant to a reorganization plan that was signed into law. "This court has often

rejected attempts by plaintiffs to challenge **on First Amendment grounds** loss of employment due to reorganizations of governmental agencies, whether the reorganization is effectuated by the legislature, by the governing board of the agency, or by the administrative head of the agency." <u>Torres Rivera</u>, 412 F.3d at 211 n. 6 (internal citations omitted) (emphasis ours). The Plaintiff's conclusory statement of discriminatory intent simply will not do, and thus, in light of the evidence on record, this court is unable to make determinations of politically-discriminatory motive *at this juncture*. Therefore, the Plaintiff's request for an injunction **on First Amendment grounds** must be **DENIED**.

## V.    CONCLUSION

The court finds that the enabling statute is clear in its language stating that the Veterans Advocate was to be appointed to a term of ten years; that the Plaintiff had a valid expectation of continuity in his employment, and thus a property interest in his office; and that he was not afforded his due process rights under the Fourteenth Amendment prior to his removal. The court also finds that Plaintiff has met his burden of proof and is entitled to a preliminary injunction on Fourteenth Amendment Grounds. Therefore, the court hereby (1) **VACATES** Lopez-Cabrera's appointment as Acting Veterans Advocate; (2) **ORDERS** defendants to allow Plaintiff to return to his position; (3) **ENJOINS** defendants from removing Mr. Montañez from his position without due process of law.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 18th day of October, 2013.

S/ <u>JUAN M. PÉREZ-GIMÉNEZ</u>
JUAN M. PEREZ GIMENEZ
UNITED STATES DISTRICT JUDGE